# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DENVER R. GRAYSON and DENVER, INC., | ) ) ) |
| Plaintiffs, | ) ) 16 C 1297 |
| v. | ) ) Judge John Z. Lee ) |
| MICHAEL J. KORST, P.C., and MICHAEL J. KORST, | ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Denver Grayson, the sole shareholder of Plaintiff Denver, Inc. (collectively, "Grayson"), previously owned a Domino's Pizza franchise, together with a partner, Daniel Shanahan. When Shanahan and Grayson sold the franchise, they were both represented by the same attorney, Defendants Michael Korst and Michael J. Korst, P.C. (collectively, "Korst"). Grayson's claims against Shanahan have been dismissed,[1] and one count of legal malpractice and breach of fiduciary duty against Korst remains. Grayson and Korst have cross-moved for summary judgment. For the reasons that follow, the Court denies Grayson's motion and grants Korst's motion.

---

[1] The Court granted Daniel Shanahan's motion to dismiss the unjust enrichment claim against him. *See Grayson v. Shanahan*, No. 16-CV-1297, 2016 WL 6962827, at *4 (N.D. Ill. Nov. 29, 2016).

## Background[2]

### I. Agreement to Purchase 51% of Milwaukee Dominos

In July 2000, Denver Grayson began working as a General Manager at a Milwaukee-area Domino's Pizza franchise owned by Daniel Shanahan. Defs.' LR 56.1(a)(3) Stmt. ¶ 5, ECF No. 39; Defs.' LR 56.1(a)(3) Stmt. Ex. B, Grayson Dep. at 12:10–14, 18:9–19:1, ECF No. 39-2. From 2003 to 2004, Grayson left to run his own pizza store, which he subsequently sold. Grayson Dep. at 19:7–20:11. He then returned to work for Shanahan at the same Domino's Pizza. *Id.* at 20:7–17.

Shanahan owned multiple franchises, some of which he owned through an entity called DDS. Defs.' LR 56.1(a)(3) Stmt. Ex. G, Shanahan Dep. at 9:4–22, ECF No. 39-7, 10:22–11:14. In 2006, Grayson and Shanahan began taking steps for Grayson to buy an ownership interest in the Domino's Pizza store. First, in October 2006, Grayson incorporated Denver, Inc. Grayson Dep. at 22:20–24. Denver, Inc. and DDS then entered into an operating agreement for DJ's Pizza, LLC, in which Denver, Inc. was allocated 51% interest and DDS was allocated 49% interest. Pls.' Mot. Summ. J.., Ex. Operating Agreement of DJ's Pizza ("Operating Agreement"), at 4, ECF No. 36-7; *id.* at Ex. 1. In March 2007, Grayson and Shanahan executed a Shareholder Agreement and a Sale Contribution and Guarantee Agreement, by which DDS agreed to transfer its ownership of the store to DJ's Pizza and Grayson

---

[2] The following facts are undisputed or deemed admitted unless otherwise noted. Grayson did not respond to Korst's LR 56.1(a)(1)(3) statement of facts as required by Local Rule 56.1. All of Korst's facts are thus deemed admitted for the purposes of this motion. *See* 56.1(b)(3)(C); *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

2

agreed to pay DDS $354,450.[3] Defs.' LR 56.1(a)(3) Stmt. Ex. C, Sale, Contribution and Guaranty Agreement, ECF No. 39-3. The result was that Grayson held a 51% interest and Shanahan retained a 49% interest in the store. Defs.' LR 56.1(a)(3) Stmt. ¶¶ 5, 6.

The Operating Agreement for DJ's Pizza designated Grayson as the manager of the company and store manager of record with Domino's Pizza LLC. Operating Agreement §§ 1, 5.1, 5.3(h)(2). It further dictated that: Grayson's compensation was set at 8% of Annual Royalty Sales of the restaurant, *id.* § 6.3; DDS earned 4% of Annual Royalty Sales, *id.* § 6.4; and net profits and losses were also to be allocated to Denver, Inc., *id.* § 9.1. The Agreement provided that, if the Company were liquidated, "distributions would be made in accordance with the positive capital account balances of the Members and assignees." *Id.* § 8.3. It also granted Denver, Inc. the option to purchase DDS's membership interest at the price of at least[4] $6,950 per 1% interest. *Id.* § 12.1. Only "the unanimous written agreement of all the Members" could amend the agreement. *Id.* § 13.2.

Grayson took out a loan to cover the full amount of his $354,450 contribution. Grayson Dep. at 32:15–21. Both Grayson and Shanahan served as personal

---

[3] Grayson testified that he and Shanahan followed Domino's "standard practice" for evaluating the value of the store, which was to multiply the store's EBITDA, "[e]arnings before interest, depreciation, taxes and amortization," Grayson Dep. at 105:16–20, by a factor of four, *id.* at 128:21–129:21. That yielded a store value of approximately $700,000, and 51% of that figure was $354,000. *Id.* at 129:15–21.

[4] The option price was set at the higher of $6,950 per 1% interest or "the prior twelve month's EBITDA of the Company as determined by normal Domino's Pizza, Inc. practice multiplied by 39.55 for each one percent 1% interest." Operating Agreement § 12.1.

3

guarantors of the loan. *Id.* at 21:11–16. The loan was fully paid off around March 2014.[5] *Id.* at 32:2–7.

## II. Events Leading Up to the Sale

For the next seven years, Grayson operated the Domino's franchise. In 2014, Grayson started considering the possibility of selling the store. Dominoes had informed Grayson that he was in default of the Franchise Agreement for various reasons, and that, even if he could cure those defaults, he needed to remodel the store by November or his franchise agreement would be terminated. Defs.' LR 56.1(a)(3) Stmt. ¶ 10.

Grayson testified that he looked into getting a loan to finance the remodeling of the store, but his requests for loans were denied. Grayson Dep. at 53:16–54:6. And according to Grayson, if he did not remodel the store, he faced being terminated as a franchisee. *Id.* at 54:11 to 55:8. Moreover, due to a non-compete agreement, being terminated would also have barred him from working locally in the pizza industry. *Id.*

At the same time, Grayson was going through a divorce. Defs.' LR 56.1(a)(3) Stmt. ¶ 12; Grayson Dep. at 145:11–15. According to Grayson, the value of his interest in the store was at issue in his divorce. Grayson Dep. at 63:15–64:5. In Grayson's financial disclosure statements filed in his divorce case in January 2014,

---

[5] At his deposition, Grayson testified inconsistently about who paid off the loan. On the one hand, he stated that he repaid the loan through the income that was allocated to Denver, Inc., Grayson Dep. at 187:4–19, and claimed that Shanahan did not contribute in any way to paying off the bank loan. *Id.* at 33:15–21. But Grayson elsewhere acknowledged that he did not recall if the loan was actually issued to DJ's Pizza, and that if it were, because he was only 51% owner, he was not certain if Shanahan might have contributed to paying back the loan. *Id.* at 34:1–9.

4

Grayson represented that his net financial interest in the store was zero dollars. Defs.' LR 56.1(a)(3) Stmt. ¶ 14.

In February 2014, Grayson emailed Shanahan, stating that he was considering selling the store and asking "what [Shanahan's] buyout would be" in the event of a sale. Grayson Dep. at 102:1–23. In the email, Grayson mentioned that he was going through a divorce, and if he kept the store, he would owe his spouse half of his income from the store for the next five to seven years. On the other hand, if he sold the store, he would split the proceeds with her "and possibly owe her nothing more." *Id.*

At the time of this email, and at every other time during 2014, Grayson appeared to have been under the impression that, to sell the store, he needed to "buy out" Shanahan's 49% portion of the store. Grayson testified that, by May 13, 2014, Grayson and Shanahan were already in agreement that Grayson would need to pay Shanahan $340,550 for the 49% in order to sell the entire store to a third-party. *Id.* at 109:17–110:10; *see also id.* at 112:19–24. Moreover, at his deposition, Grayson did not dispute that, when he entered into the 2007 agreement, he agreed to a minimum price for any buyout of Shanahan's shares. *Id.* at 183:22–184:7. According to Grayson, he agreed to the minimum price because he "wanted to own the store" and "[i]t was the offer that [he] was given." *Id.* at 184:3–5. For Shanahan's part, he claims that, he and Grayson "were in complete agreement from day one . . . that [Shanahan's] value could never fall below $340,550." Shanahan Dep. at 58:10–12.

5

Meanwhile, sometime on or before May 2, 2014, Shanahan asked his attorney, Michael Korst, to review the Operating Agreement, Shareholder Agreement, and the Sale, Contribution and Guaranty Agreement. *See* Pls.' Mot. Summ. J., Exhibit 5/2/2014 Email from Korst to Shanahan at Korst 02331, ECF No. 36-9. According to Korst, Shanahan specifically asked whether he would be entitled to a preferred payment upon the sale of assets or sale of the business known as DJ's Pizza. Defs.' LR 56.1(a)(3) Stmt., Ex. H, Korst Dep. at 13:11–15, ECF No. 39-8. On May 2, 2014, Korst responded to Shanahan by email, explaining that he could not find "anything in the documents that provides that you are to be paid before Denver in the event of a sale of the store or in the event the store shuts down and liquidates." *Id.*; Pls.' LR 56.1(a)(3) Stmt. ¶ 6.

### III. Finalizing the Sale

By the end of October, a sale was in the works. On October 24, 2014, Grayson emailed his divorce attorney, Thomas Schneck, a copy of the Sale of Assets Agreement from John Thiesen of Brew City Pizza, the potential buyer. Defs.' LR 56.1(a)(3) Stmt. ¶ 19. The agreement specified that the purchase price was $360,550, and that $340,550 of that price would be paid directly to DDS/Shanahan. *Id.* Grayson discussed the agreement to sell with his divorce attorney, *id*, although Grayson testified he did not recall what the attorney said about the agreement. Grayson Dep. at 55:24–56:7.

According to Korst, Shanahan asked him to review a copy of the same agreement. Korst Dep. at 13:19–14:1. Korst offered his comments on the

6

agreement and asked Shanahan if there was "any dispute with Denver as to [Shanahan] getting [his] money first." Pls.' Mot. Summ. J., Ex. Korst 10/27/2014 Email to Shanahan at Korst 02334, ECF No. 36-9. In his email response, Shanahan did not respond to the question, but stated that he was hiring Korst to "handle this." Pls.' Mot. Summ. J., Ex. Shanahan 10/27/2014 email to Korst at Korst 02334, ECF No. 36-9.

On October 28, Shanahan asked Grayson if Grayson wanted to use Korst—Shanahan's attorney—to "represent [Grayson] at the closing." Pls.' Mot. Summ. J., Ex. Shanahan-Grayson Text Messages at SHAN_000970, ECF No. 36-9; Pls.' LR 56.1(a)(3) Stmt. ¶ 9. Shanahan also stated that he would pay for Korst's fees. Shanahan-Grayson Text Messages at SHAN_000970. Grayson accepted the offer. *Id.* According to Grayson, he had no problem with retaining Korst in closing the transaction. Grayson Dep. at 97:8–20. He had not planned on hiring his own lawyer because he could not afford one. *Id.* at 157:17–158:5.

According to Korst, Shanahan suggested that Korst represent the company, and Korst told Shanahan that he could do so as long as there were "no issues between [Shanahan and Grayson]." Korst Dep. at 25:3-13. A few days later, Korst spoke with Grayson on the phone and "confirmed" with Grayson that there were no issues between the two. *Id.* at 22:10–15; *see also id.* at 26:8–27:9. Korst did not, however, question Grayson about his understanding of the Operating Agreement. *See id.* at 22:16–18. According to Korst, there was no need: the asset purchase agreement demonstrated that there was already a set agreement between

7

Shanahan and Grayson that Shanahan would receive $340,550 of the sale price. *Id.* at 23:6–10.

It is undisputed that Korst never issued a job engagement letter. *Id.* at 11:13–21; Defs.' Resp. Pls.' LR 56.1(a)(3) Stmt. ¶ 13. But Korst testified that the scope of his employment was solely to "represent the company in the sale of their assets." *Id.* at 21:10–12. As Shanahan and Grayson had come to him with an agreement already worked out between the two for the division of their compensation, it was not within the scope of his employment to investigate the basis for that agreement, *id.* at 21:12–16, or "to go back and determine whether or not that Operating Agreement was correct or not correct," *id.* at 23:17-18. Instead, Korst claims his role was "to close the deal for the two of them." *Id.* at 23:20–21.

On November 4, 2014, Grayson's divorce attorney filed a Notice and Motion to Approve Sale of Asset in the Wisconsin divorce court. Defs.' LR 56.1(a)(3) Stmt. ¶ 28. The attorney also filed an affidavit stating that, for Grayson to sell the franchise, he would need to pay the existing loan obligation to Shanahan, and that Grayson did not anticipate any net proceeds from the sale. *Id.* The motion was later withdrawn because Grayson's wife had agreed to sign off on the sale. *Id.* ¶ 31.

On November 10, 2014, DJ's Pizza and Brew City closed on the sale of the franchise. Under the Sale of Assets Agreement that Grayson signed that day, the purchase price was $360,550, of which $340,550 would be paid to DDS. *Id.* ¶ 34. Grayson had already been formally terminated by Domino's as a franchisee on November 3, 2014, but the termination was stayed pending the sale. *Id.* ¶ 42.

8

Since the sale of the store to Brew City, Grayson has been employed by Brew City Pizza as a district manager, earning $52,000 a year in salary, with an annual bonus of $36,000. *Id.* ¶ 42; Grayson Dep. at 14:6–15:3. Grayson had already received a full-time offer of employment from Brew City before the closing. *Id.* at 177:5–15.

After the closing, Korst asked Grayson and Shanahan to sign a waiver of conflict letter. Korst Dep. at 11:17–21; Defs.' Resp. Pls.' LR 56.1(a)(3) Stmt. ¶ 16; Pls.' Mot. Summ. J., Ex. Conflict Letter, ECF No. 36-9. The letter was dated November 7, 2014, but email records indicate that Korst emailed the letter to Grayson and Shanahan on November 11, 2014. *See* Conflict Letter; Pls.' Mot. Summ. J., Ex. Grayson 11/11/2014 email to Korst, ECF No. 36-9. The letter explained that Korst had been requested to represent DJ's Pizza, and notes that Grayson and Shanahan might "not necessarily have the same interests in this transaction." Conflict Letter. It then stated that Korst "believe[d] that acting as the attorney for the LLC" would not adversely affect his relationship with each of them individually, "provided [they] both agree with the sale terms and the disbursement of the proceeds of the sale." *Id.* He indicated that each person was "free to seek their own independent legal counsel to review the transaction on behalf of the LLC." *Id.* Shanahan and Grayson each returned a signed version of the letter consenting to the representations in the letter. Pls.' Mot. Summ. J., Ex. Conflict Letter signed by Shanahan, ECF No. 36-9; Pls.' Mot. Summ. J., Ex. Conflict Letter signed by Grayson, ECF No. 36-9.

Around March 2015, Grayson met with his accountant to do the corporate taxes for DJ's Pizza. Grayson Dep. at 113:12–17. According to Grayson, that was the point in time at which he concluded that the division of proceeds from the sale was inaccurate and that he was entitled to much more of the proceeds than what he had received. *Id.*

## **Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

## Analysis

Grayson alleges that Korst committed legal malpractice[6] by not disclosing to Grayson, while representing both Grayson and Shanahan as members of DJ's Pizza, "that Denver, Inc was entitled to receive its unpaid guaranteed payments from the proceeds of closing and by not disclosing to [Grayson] that Denver, Inc. was entitled to cash distributions pursuant to Article 9 of the Operating Agreement." Compl. at ¶¶ 14, 15, ECF No. 1.

Both Korst and Grayson move for summary judgment on this claim, the only remaining claim in the case. To sustain a legal malpractice claim, a plaintiff must prove that (1) the defendant attorney owed the plaintiff a duty of due care arising from the attorney-client relationship; (2) the defendant breached that duty, and; (3) as a proximate result, the plaintiff suffered injury. *N. Ill. Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 837 N.E.2d 99, 106 (Ill. 2005); *accord Ball v. Kotter*, 723 F.3d 813, 822 (7th Cir. 2013) (citing *Wash. Grp. Int'l, Inc. v. Bell, Boyd & Lloyd, LLC*, 383 F.3d 633, 636 (7th Cir. 2004)).

Korst contends that because Grayson has not proffered a legal expert to establish the applicable standard of care, he cannot demonstrate that Korst

---

[6] The Court construes Count II, which asserts a claim for "legal malpractice and breach of fiduciary duty," Compl. at 3, ECF No. 1, solely as a claim for legal malpractice. Under Illinois law, "while claims for legal malpractice and breach of fiduciary duty may be conceptually distinct, when such claims are supported by the same operative facts and result in the same injury to the plaintiff, the breach of fiduciary duty claim is duplicative of the malpractice claim and should be dismissed." *Pippen v. Pedersen & Houpt*, 986 N.E.2d 697, 704 (Ill. App. Ct. 2013) (citing *Nettleton v. Stogsdill*, 899 N.E.2d 1252, 1267 (Ill. App. Ct. 2008)). *See, e.g., Hoagland v. Sandberg, Phoenix & von Gontard, P.C.*, 385 F.3d 737, 744 (7th Cir. 2004) (construing a breach of fiduciary duty claim against an attorney for favoring one client's interests over another as a claim for legal malpractice).

breached his duty of care. Defs.' Mem. Supp. Mot. Summ. J. at 6. Because the Court agrees that Grayson's failure to proffer a legal expert is fatal to his claim, the Court does not consider Korst's remaining arguments for summary judgment.

A plaintiff in a legal malpractice case must establish that the defendant attorney failed to exercise a reasonable degree of care or skill. Generally, under Illinois law, the standard of care in a legal malpractice case must be established through expert testimony, and "[f]ailure to present expert testimony is usually fatal to a plaintiff's legal malpractice claim." *Barth v. Reagan*, 564 N.E.2d 1196, 1199–1200 (Ill. 1990); *see Shanley v. Barnett*, 523 N.E.2d 60, 64 (Ill. App. Ct. 1988) ("When a plaintiff [in a legal malpractice action] cannot obtain expert testimony to establish negligence, summary judgment is appropriate."). But there is an exception. "[W]here no issue is raised as to defendant's responsibility for allowing the statute of limitations to run, where the negligence of defendant is apparent and undisputed, and where the record discloses obvious and explicit carelessness in defendant's failure to meet the duty of care owed by him to plaintiff," expert testimony is not required. *Ball*, 723 F.3d at 822 (citing *Brainerd v. Kates*, 386 N.E.2d 586, 589 (Ill. App. Ct. 1979)). In other words, an expert is not necessary where a "lay person" can recognize or infer negligence from the facts. *Barth*, 564 N.E.2d at 1200. This is referred to as the "common knowledge" rule. *Id.*

According to Korst, the common knowledge rule does not apply to the facts of the present case, and therefore Grayson's failure to procure expert testimony is fatal to his claim. Defs.' Mem. Supp. Mot. Summ. J. at 6–9. Korst contends that

the common knowledge of lay persons does not encompass the nuances of how an attorney should represent two clients during the closing stages of the sale of a business, especially when the clients already have an agreement between themselves regarding their respective interests in the franchise, and the clients agree to waive any potential conflicts of interest arising from the dual representation. *Id.* at 8.

Illinois courts have found the common knowledge rule to apply in cases where an attorney fails to comply with the statute of limitations or "where the attorney fails to take any action whatsoever in regard to the matters entrusted to him by a client." *Fox v. Seiden*, 53 N.E.3d 1005, 1013 (Ill. App. Ct. 2016); *see, e.g., House v. Maddox*, 360 N.E.2d 580, 584 (Ill. App. Ct. 1977) (applying the common knowledge rule where an attorney failed to file a case with a valid claim within the statute of limitations); *Gray v. Hallett*, 525 N.E.2d 89, 92 (Ill. App. Ct. 1988) (where an attorney failed to effect service of process within the statute of limitations); *Sorenson v. Fio Rito*, 413 N.E.2d 47, 53 (Ill. App. Ct. 1980) (where an attorney took no action on estate matter within requisite time period).

By contrast, Illinois courts consistently have held that expert witness testimony is necessary in legal malpractice cases where the plaintiff is alleging a conflict of interest. The Illinois Supreme Court addressed this question in *Barth v. Reagan*, where an attorney had allegedly committed malpractice in a foreclosure action by communicating solely with her client through the client's husband, a co-defendant in the action. *Barth,* 564 N.E. 2d at 1201. The Supreme Court identified

13

the relevant issue as one of "conflicting interest," in that the defendant was simultaneously representing two clients with potentially adverse interests. *Id.* The Court explained that "the concerns an attorney has regarding his or her professional responsibilities in this area [are] complex" and stated that it did not "find the intricacies of this type of representation to be within the common knowledge of lay persons." *Id.* (internal citations omitted). The Court further distinguished between cases "involve[ing] an obvious deadline which the attorney clearly missed"—which would qualify for the common knowledge exception—and those involving "a question of which of two potentially adverse clients deserve[d] the attorney's attention and loyalty"—which require expert testimony, lest a lay person be "misled." *Id.* at 1201–02.

Similarly, in *Ball v. Kotter*, the plaintiffs alleged that a lawyer had failed to disclose a conflict of interest in the representation for a sale of real estate to a client. The Seventh Circuit rejected the application of the common knowledge rule, noting that "recognizing conflicts of interest in a legal transaction do[es] not fit within . . . the purview of a lay juror." *Ball*, 723 F.3d at 823–24; *see also Schmidt v. Hinshaw, Culbertson, Moelmann, Hoban & Fuller*, 394 N.E.2d 559, 564 (Ill. App. Ct. 1979) (holding that plaintiff could not demonstrate negligence without an expert witness, where plaintiff alleged that defendant law firm negligently drafted agreements for the sale of plaintiff's business and represented conflicting interests).

The present case, which turns on whether Korst committed legal malpractice by representing both Shanahan and Grayson in the sale of their business, but

14

failing to tell Grayson that he might have been entitled to a share of the proceeds, involves the question of the appropriate standard of care in simultaneously representing in the sale of a business two partners, who may have adverse interests. Unlike a situation where an attorney has failed to file a valid claim within the statute of limitations, the legal questions in this case are fairly complex. Relevant questions might include whether Korst had a duty to investigate the underlying agreement between Grayson and Shanahan and whether Korst had any type of heightened duty given his earlier review of DJ's Pizza's documents at Shanahan's request. These questions are beyond the knowledge of a lay person.

Grayson does not attempt to argue that this case falls within the common knowledge exception. Instead, Grayson contends that an expert is not required because he is not claiming that Korst was negligent, but rather that Korst "intentionally misled" him in favor of Shanahan, a longtime client. Pls.' Mem. Opp. Defs.' Mot. Summ. J. at 1, ECF No. 40. According to Grayson, an expert is not needed to explain that "Korst intentionally favored one client over another." *Id*. But Grayson, who is represented by counsel, cites no law in support of his argument that intentional malpractice does not require expert testimony to establish the applicable standard of care. *See generally id.* at 1–2. And whether the alleged malpractice was intentional or not, a plaintiff would still need to establish the standard for due care in order to prove that legal malpractice occurred.[7]

---

[7] The Court also notes that, even if it had not construed Grayson's claim for "legal malpractice and breach of fiduciary duty" as solely a claim for legal malpractice, Grayson would still not be able to escape the requirement of expert witness testimony. A plaintiff cannot use a breach of fiduciary duty claim to escape the requirement of establishing the

The Court therefore finds that Grayson's legal malpractice claim does not fall within the common knowledge rule. As Grayson has not proffered an expert to testify as to this issue, his claim for legal malpractice must fail because he cannot demonstrate the applicable standard of care or that Korst breached that standard.

## Conclusion

For the foregoing reasons, the Court grants Korst's motion for summary judgment [37] and denies Grayson's motion as moot [36]. Judgment is entered in favor of Defendants Michael J. Korst, P.C., and Michael J. Korst. Civil case terminated.

**IT IS SO ORDERED.**     **ENTERED   3/16/18**

_____
**John Z. Lee**
**United States District Judge**

---

professional standard of care using expert testimony, even if he attempts to argue that the breach of fiduciary duty claim is premised on an intentional tort rather than negligence. "An attorney's throwing one client to the wolves to save the other is malpractice, whatever the plaintiff chooses to call it." *Hoagland*, 385 F.3d at 744 (internal citations omitted). And a plaintiff "cannot be permitted . . . by calling the conflict of interest a breach of fiduciary obligation . . . to get around the requirement of presenting expert testimony." *Id.* As Grayson's claims are duplicative (if, indeed, he intended to plead separate claims of legal malpractice and breach of fiduciary duty), both claims would fail due to Grayson's failure to proffer an expert witness.